**Judy BURCHFIELD, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. S87–0617(R).**

United States District Court,
S.D. Mississippi, S.D.

Nov. 16, 1990.

David B. Strain, Rae Bryant, Gulfport, Miss., for plaintiff.

Stephen R. Graben, U.S. Dept. of Justice, Biloxi, Miss., for defendant.

## MEMORANDUM ORDER

DAN M. RUSSELL, Jr., District Judge.

This cause is before this Court on a complaint filed on October 1, 1987, by the plaintiff, Judy Burchfield, against the defendant, the United States of America, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680.

The complaint is for monetary compensation for personal injuries and property damage sustained by the plaintiff which were caused when she was assaulted in her home on October 3, 1985, by a disabled veteran who had been a patient at a facility operated by the defendant.

## FACTS

A trial on the above styled cause was held on or about October 22, 1990, during which the following was presented by live testimony, deposition, and exhibits.

It is undisputed that on the morning of October 3, 1985, William Dyer, a thirty-seven year old black male, was voluntarily admitted to the Gulfport Psychiatric Division (Gulfport division) of the Biloxi Veterans Administration Medical Center (hereinafter "BVAMC").

After being examined at the BVAMC emergency room, Dyer was transferred to the Gulfport division and assigned to an "open ward."

Dyer was seen by several staff members off and on from his admission. He was last seen between 6:30 p.m. and 7:00 p.m. and his absence was recorded at 9:00 p.m. when the staff did a "bed check."

At approximately 8:30 p.m. on the night of October 3, 1985, Dyer entered the house of the plaintiff and assaulted her. The Gulfport Police Department responded to the plaintiff's telephone call, made prior to the assault, and arrested Dyer.

Dyer was charged and convicted of attempted rape and felonious burglary of an occupied dwelling in connection with the assault.

## I.

At the trial on this cause the majority of the testimony centered around the plaintiff's contention that the defendant's agents violated the standard of care required of persons and treatment facilities when dealing with psychiatric patients as well as failing to follow their own written policies regarding such treatment.

The following is a summary of the testimony of witnesses regarding Dyer's diagnosis and the decision to admit him to an open ward.

### BETTY TRISTAN

Ms. Tristan is a clinical social worker employed at the BVAMC on October 3, 1985. She interviewed Dyer's mother, Dorothy Spann, regarding his reasons for wishing to be committed.

Referring to her notes, as recorded at 10:30 a.m. in plaintiff's Exhibit 1(C) on page 913, she represented to the Court that Dyer suffered from a service connected nervous disorder and was 80% disabled.

Dyer had been living alone near his mother's home in Louisiana when he started causing a disturbance. Specifically, he was knocking on neighborhood doors at night and making phone calls. After being notified of his behavior, Mrs. Spann went to his house the morning of October 3, and found that the heat was turned up; the bathtub was overflowing; the mattress had been pulled off of the bed; drawers had all been pulled out of dressers; and other evidence of general destructive behavior by Dyer.

Dyer's mother did not think he was psychotic but she stated that he had a history of schizophrenia and she suspected that he was responding to "voices." She wanted him to be hospitalized as soon as possible.

Ms. Tristan did not personally interview Dyer because he did not want to be interviewed. During Ms. Tristan's interview with his mother, Dyer was walking up and down the hall.

Ms. Tristan stated that prior to being sent to her, Dyer would have been seen in the emergency room, and if his condition had been acute, he would have been kept there.

At no time did anyone represent to Ms. Tristan that Dyer was a danger to himself or others.

### WILLIAM McCAUGHN

Mr. McCaughn is a licensed clinical social worker and on October 3, 1985, he was employed at the Gulfport division.

Regarding assignment of patients to open or closed wards, McCaughn testified that generally Biloxi personnel determined ward assignments; however, Gulfport personnel could change it to a closed ward if the patient's behavior so indicated and that this could be done without going through a commitment process.

Regarding "elopement"—leaving without telling the staff—and "AMA"—leaving against medical advice—McCaughn stated that while hospital personnel could encourage a voluntary patient to stay, they could not force him to do so. He further elaborated that if they thought the patient was dangerous enough, they had the right to keep him five days or 72 hours until he could be committed.

McCaughn saw Dyer at 3:45 p.m. and according to his notes on page 915 of plaintiff's Exhibit 1(C), Dyer's problems were related to his brother's mental illness and his attempts to assist his brother.

McCaughn had seen Dyer five or six times during prior hospitalizations since 1981 or 1982. He testified that Dyer had never been a problem; however, he did have to restrain Dyer once and was aware that he had eloped from an open ward on a previous occasion.

The witness said that he had heard that Dyer had attempted to rape a teenager but that he had not been indicted and that it involved money for sex.

When questioned concerning his knowledge of instances of violent and disruptive behavior by Dyer, which apparently occurred several years prior, the witness was generally unfamiliar.

Regarding the voices which Dyer said he heard, the witness said that Dyer told him that they were of a threatening nature; told him to do "bad things"; were hard to understand; and called him a "M.F." Dyer told McCaughn that he knew the voices were not real and was not going to do anything about them. After questioning Dyer, McCaughn did not believe he would do anything.

McCaughn stated that he thought Dr. Erickson was present during the questioning about the voices.

The witness said that he did not have Dyer's complete records at the time and did not see a need to ask for them.

### DR. MILES ERICKSON

Dr. Erickson is a psychiatrist who, on October 3, 1985, was employed as a staff psychiatrist and assigned to an open ward at the Gulfport division.

Referring to his notes found on pages 917–921 of plaintiff's Exhibit 1(C), Dr. Erickson represented that he interviewed Dyer at "15:30." He noted that Dyer was diagnosed as a schizophrenic decompensating and that he was restless, hearing voices, talkative and cooperative.

Dr. Erickson stated that Dyer had already been assigned to an open ward by Biloxi staff and he countersigned the order.

Dr. Erickson was not the regular psychiatrist assigned to this ward and had never seen Dyer prior to October 3, 1985; however, he and Bill McCaughn worked together on Dyer's interview.

He could have placed Dyer in a closed ward; however, Dyer gave him no indication that he should change what Biloxi had started.

Responding to questions as to what minimum symptoms or behaviors would justify putting a patient in a closed ward and holding him for 72 hours or five days, Dr. Erickson stated that by some means he would have to indicate that he would do harm to himself or someone else.

Dr. Erickson repeatedly asserted that the patient's past activities could not be the basis for detention.

Regarding the voices which Dyer was said to have heard, Dr. Erickson said that he did not hear Dyer say they were telling him to do bad things. It was the witness' opinion that voices are a secondary symptom of schizophrenia and are not "that important."

At the time of the interview Dr. Erickson did not have Dyer's prior records.

### DR. J.W. SEASTRUNK

Dr. Seastrunk is a psychiatrist who, having heard the testimony and reviewed the exhibits, is offered by the plaintiff as an expert on the standard of care and as to whether the defendant's agents properly admitted Dyer to an open ward.

Dr. Seastrunk stressed the need to evaluate a patient with particular emphasis on family history and the patient's past behaviors. He noted that Dyer had spent seven of the past fifteen years in psychiatric hospitals which, in addition to the Gulfport division, included Greenwell Springs Hospital in Louisiana, East Louisiana State Hospital and the Alexandria Louisiana VA Hospital.

The witness testified that what happened to Dyer in the past is important as a means to determine his pattern.

Having reviewed the policies of the Gulfport division, as set out in plaintiff's Exhibit 6, Dr. Seastrunk identified several violations which in summary are:

1. Based upon his mother's statements and his pacing, Dyer should have been seen as a danger to others and, as such, should have been placed in a closed ward;

2. Having a history of eloping, Dyer should have been continuously observed; and

3. Dyer should not have been given ground privileges.

Regarding the "voices", the witness stated that voices which are threatening and telling him to do bad things were evidence that Dyer needed to be placed in a closed ward.

Dr. Seastrunk stated that in his opinion the violations of policies and standard of care by the defendant's agents were related to Dyer's attack of the plaintiff.

The witness also testified concerning the plaintiff's post traumatic stress disorder which resulted from the attack on Dyer.

## DR. JOE SPRINGER

After the plaintiff rested, the defendant called Dr. Springer who was employed on October 3, 1985, as admitting physician in the emergency room of BVAMC, a position he had held since 1982.

Dr. Springer testified that he saw Dyer after the physician's assistant took a history of the patient and gave him a physical examination and after a history was taken by R.N. Bishop, as reflected on VA form 10–10M, page 911 of plaintiff's Exhibit 1(C).

Regarding his care and treatment of Dyer, the witness stated that Dyer was taken to the observation room where he was made comfortable and periodically observed by the witness to determine the appropriate referral.

Dr. Springer's diagnosis was that Dyer was "schizophrenia decompensating" and recommended sending him to an open ward in Gulfport. According to the witness, Dyer presented no indication that he was homicidal or suicidal.

## FLORENCE SANDERS, R.N.

Mrs. Sanders has been a staff nurse at the Gulfport division for nine years and was assigned to Ward 4, which was an open ward. She stated that open ward patients are allowed to go on the grounds on their own for any reason.

The witness stated that she knew Dyer because he had been a patient on her ward several times.

When the witness came on duty about 3:30 p.m., Dyer was outside greeting the staff and acting pleasantly.

Mrs. Sanders called Dyer to the nurses' station around 4:00 p.m. and interviewed him as part of the admission procedure.

At the interview, which lasted twenty-five to thirty minutes, Dyer showed no acute distress or dangerous behavior. He told Nurse Sanders that he was there because his mother wanted him to come in. She saw no reason why Dyer should not be on her ward.

The witness stated that she saw Dyer about 5:00 p.m. when he went to the dining hall with three or four staff members and other patients and once again between 6:30 p.m. and 7:00 p.m. when he was going to Chapel for recreation and food.

At 9:00 p.m., when they did the bed check Dyer was missing.

## DR. WOOD C. HIATT

Dr. Hiatt is a psychiatrist at the University of Mississippi Medical Center in Jackson, Mississippi, who is familiar with the VA Hospital at Gulfport and Jackson.

Dr. Hiatt testified that:

1. Dyer was properly evaluated and admitted;

2. Dyer was seen by several people over a period of several hours;

3. The assessments made were adequate; and

4. The treatment complied with the standard of care.

Regarding Dyer's placement in an open ward, Dr. Hiatt testified that this was proper.

Regarding Dyer's history, Dr. Hiatt stated that events more than a year in the past are relatively unimportant.

## GLORIA HUSBAND

Mrs. Husband operates a foster home for the VA in Maxie, Mississippi, and has done so for ten years.

She testified that Dyer was a resident in her home for about fifteen months, beginning in January, 1984. According to Mrs. Husband, Dyer was nice, clean, cooperative and never destructive. She said he even played ball with her children.

Mrs. Husband said that Dyer left to "give his mother away" at her wedding and though he did not return, he could have.

### DR. DONALD C. GUILD

Dr. Guild is a psychiatrist from Jackson, Mississippi, who has been in private practice for nineteen years. He also holds a law degree.

The witness testified that according to the law and standard of care regarding the treatment of psychiatric patients, institutions are to place the patient in the least restrictive environment.

Based upon his review of the record and familiarity with such patients, Dr. Guild's opinion was that Dyer was a "21 day" person who came into the VA periodically to obtain 100% benefits which normally drop back to 70% within three months. This awareness of how to work the system was referred to as "street wise", which the witness said could have been the reason Dyer said he heard voices.

Dr. Guild's opinion regarding the appropriateness of Dyer's assessment at Gulfport was that it was appropriate and that he would have made the same diagnosis and assessment.

Regarding the weight to be given to Dyer's history, Dr. Guild indicated that the violent behavior of the patient in November of 1983 was too remote considering his two-year history of good behavior.

### DR. HENRY MAGGIO

Dr. Maggio is a Gulfport psychiatrist with seventeen years experience evaluating persons involved in felony cases and civil actions, as well as commitment evaluations for the Gulfport division. He has also treated schizophrenics for twenty years.

Regarding the standard of care, the witness testified that a patient who presents himself for treatment should be placed in the least restrictive environment commensurate with his condition.

Based upon his two examinations of Dyer in connection with his competency to stand trial and upon his review of the record, Dr. Maggio's opinion was that

Dyer's assault of the plaintiff was the result of lowered inhibitions caused by his drinking whiskey and smoking marijuana after eloping.

Dr. Maggio said that the plaintiff was randomly selected and that her assault was not reasonably foreseeable. He also stated that Dyer's assignment to an open ward was appropriate.

### DOROTHY SPANN (BY DEPOSITION)

Mrs. Spann is Dyer's mother. She stated that since he came out of Vietnam, eighteen or nineteen years prior, he had been in psychiatric hospitals in Texas, Louisiana and Mississippi, and that he had been in the Gulfport VA Hospital many times.

She stated that he had been committed a "good many" times and that he had a family history of mental illness; both his father and grandmother having died in mental institutions.

Regarding the circumstances leading to her bringing Dyer to Biloxi on October 5, 1985, she stated that he had been going around disturbing people in the neighborhood so she took him to the VA in Baton Rouge but as they had no psychiatrist, she brought him to Biloxi.

Mrs. Spann testified that she told a lady social worker that Dyer was "on a war path" and that "he needed to be locked up." She further stated that Dyer "needed to be picked up off the street so he wouldn't do no harm to himself or no one else, because he was plumb out of it."

### II.

On the issue of damages to the plaintiff, Judy Burchfield, the Court was presented the following testimony.

### DR. J.W. SEASTRUNK

Dr. Seastrunk testified that Ms. Burchfield suffered from post traumatic stress disorder which, while somewhat resolved, could be chronic and could be reactivated. He described the disorder as being characterized by sudden feelings that the assault

could happen again and withdrawing socially.

Based upon his examination of the plaintiff, he said that she had experienced fear of her home, loss of sleep, anxiety at sounds and shadows, fear of people touching her throat, nightmares, and feelings of rage. He also said that she did not seek psychiatric treatment because of her fear of reliving the experience.

### MRS. VIRGINIA BURCHFIELD

Mrs. Burchfield is the plaintiff's mother. She testified that she noticed that her daughter was not "happy-go-lucky" anymore; was jittery; impatient; and avoiding visiting their home in Wiggins, Mississippi, because everyone knew of the assault.

She also noticed that the plaintiff began pulling out her own hair to the point of making a bald spot.

### JUDY BURCHFIELD

She stated that her home is located two blocks west of the VA on Second Street which "deadends" at the VA gate.

Ms. Burchfield stated that she never saw guards at the gate on Second Street.

On October 3, 1985, the plaintiff was a physical therapist.

The plaintiff testified that after the assault she was afraid to be alone in her home, had difficulty sleeping, and was very sensitive to noises. She stated that she got a gun and a dog and "blocked" the windows.

Ms. Burchfield thinks that having a security system installed would be helpful.

The witness produced a statement of costs to replace three doors and all locksets in her home, P-8, which totalled $1,898.00; a statement of costs for emergency room treatment, P-9, which totalled $117.90; and a receipt for replacement of bed linens, P-10, costing $160.56. She also stated that she was seen by her OBGYN and went to the Health Department for VD tests. All tests were negative.

### DISCUSSION

Citing *Grisham v. John Q. Long V.F.W. Post, No. 4057, Inc.*, 519 So.2d 413 (Miss. 1988), the defendant asserts that under Mississippi substantive law the elements of a cause for negligence are: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) damages; and (4) a causal connection between the breach and the damages.

Both parties substantially agree that the central broad issue herein is what duty, if any, is owed to a third party by a psychiatric care provider with respect to the conduct of a patient. Additionally, the parties agree that Mississippi law is silent on this issue.

In the interest of judicial efficiency and in an attempt to not unduly invade the province of the Mississippi Supreme Court, this Court would first narrow the issue by deciding a factual dispute about which there was produced an abundance of evidence.

*I. Did the defendant's agents at BVAMC and the Gulfport Division properly admit William Dyer to an open ward?*

The plaintiff cites this Court to *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185 (D.Neb.1980), which this Court finds helpful in part wherein it is stated that "a psychotherapist is not subject to liability for placing his patient in a less restrictive environment, so long as he uses due care in assessing the risk of such a placement." *Id.* at 192.

Following the lead of the *Lipari* court, this Court focuses initially on whether the defendant's psychiatric care givers used due care under the facts as presented.

In summary, this Court notes that the evidence presented by the plaintiff focused on (1) Dyer's previous violent behavior while hospitalized, the most recent of which was in November of 1983; (2) his disruptive behavior at his home and in his neighborhood the day before he was brought to Biloxi by his mother; (3) his mother's statements that he was "on a war path" and

needed to be locked up; and (4) the "voices" he said he heard.

The defendant's witnesses stressed (1) the remoteness—two years—of his latest violent behavior; (2) his "good" behavior while a resident at the Husband home; (3) his uneventful stay at Gulfport from August 12 to August 21, 1985, during which time he was assigned to an open ward; and (4) his interviews and observations by psychiatrists, nurses, and social workers, two of which knew him, over a period of several hours.

The defendant's expert witnesses presented themselves as (1) familiar with the procedures followed at Veterans hospitals in general and the Gulfport facility specifically; (2) having worked with schizophrenia patients for many years; and (3) knowledgeable as to the evolution of the standard of care and commitment considerations involved in the treatment of psychiatric patients.

While this Court consciously avoids any weight being given to numbers of witnesses, it is of the opinion that Dr. Seastrunk's lack of recent experience with Veterans hospitals and lack of significant first hand experience with Dyer in particular was not sufficient to convince this Court, by a preponderance of the evidence, that the defendant's agents erred in assigning Dyer to an open ward.

Having decided that Dyer was properly admitted, notwithstanding hindsight to the contrary, this Court proceeds to refine the issue.

## II. Does the Gulfport division of the BVAMC have a duty to unidentified third parties to control voluntary patients?

At the outset, this Court laments the lack of any significant evidence as to (1) the physical "layout" of the Gulfport facility; (2) the number and location of nurses' stations; (3) the number and location of exterior doors; (4) exterior lighting; or (5) the number and location of guards and guard stations during the time period involved.

The Court notes the aforementioned, not in an attempt to detract from the plaintiff's case as pled and argued, but because it appears that a bit more supervision might have prevented the elopement.

The testimony regarding control of voluntary patients assigned to open wards was generally that they had complete freedom to go outside onto the grounds and that, while they were urged to stay, they could leave if they chose; either by eloping or against medical advice.

Apparently, the principal reaction to elopement or to leaving AMA is to discharge the patient unless he or she indicates an inclination to leave while appearing to be harmful to themselves or others.

Referring to Miss.Code Ann. § 41–21–103(6) (1972) (as amended effective July 1, 1984), which the plaintiff argues, is made applicable by inference in 38 C.F.R. § 17.34(a)(4), we find the following language:

Any voluntary admittee may leave a treatment facility after five (5) days, excluding Saturdays, Sundays and holidays, after he gives any member of the treatment facility staff written notice of his desire to leave, unless prior to leaving, the patient withdraws such notice by written withdrawal or unless within said five (5) days a petition and the certificates of two (2) examining physicians, or one (1) physician and one (1) psychologist, stating that the patient is in need of treatment, are filed with the chancery clerk in the county of the patient's residence or the county in which the treatment facility is located, provided that if the admittee is at Mississippi State Hospital at Whitfield such petition and certificates shall be filed with the chancery clerk in the county of patient's residence or with the chancery clerk for the first judicial district of Hinds County, and the chancellor or clerk shall order a hearing pursuant to sections 41–21–61 through 41–21–107. The patient may continue to be hospitalized pending a final order of the court in the court proceedings.

While this Court might desire to interpret "may leave" more forcefully, there is no evidence presented or law that this

Court is aware of which would allow us to convert this language into a mandate of control.

The plaintiff urges this Court to find that Mississippi law allows for the application of Section 315 and 319 of the Restatement (Second) of Torts to impose a duty upon the defendant to control Dyer's conduct. The relevant, if applicable, portions of sections 315 and 319 as set out by the plaintiff are:

Section 315—General Principle

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to other unless

(a) a special relationship exists between actor and the third person which imposes a duty upon the actor to control the third person, or

(b) a special relationship exists between the actor and the other which gives to the other a right to protection.

Section 319 states as follows:

Section 319. Duty of those in charge of person having dangerous propensities.

(1) he who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

If, while declining to find these sections to be the substantive law of Mississippi, this Court applies them for the sake of argument, then, as noted by the defendant, the inquiry becomes whether the physician-patient relationship under these facts imposed a duty on the defendant to control Dyer's conduct.

As authority to the contrary, the defendant cites *Hasenei v. United States*, 541 F.Supp. 999, 1009 (D.Md.1982), wherein it is stated:

Implicit in that exception [Section 315], however, is the proposition that such a special relationship must include the right or the ability to control another's conduct. Restatement §§ 316–319 lists the relationships which require the actor to control the third person's conduct. Restatement § 315 Comment c. In all

those relationships, the actor has either the right or the ability to control the third person's conduct. Thus, in the absence of a relationship involving such control, the exception to the general rule, that there is no duty to control the conduct of a third person for the protection of others, should not be applicable. (Footnotes omitted).

 This Court finds that, absent any duty to control voluntary patients such as Dyer under these facts, and as it is uncontroverted that Ms. Burchfield was a randomly selected victim of Dyer's unforeseeable attack, no duty was owed to the plaintiff by the United States and hence no breach of any duty occurred.

This Court, finding no breach of any duty to the plaintiff, Judy Burchfield, by the defendant, United States of America, finds for the defendant with costs assessed to the plaintiff.

ORDERED AND ADJUDGED.