**Don DePALMA, individually and as surviving spouse of Sandra DePalma, and as next of kin of Connie Neal, Kenneth DePalma, and Tammy DePalma, all deceased; Joseph DePalma, individually and in his representative capacity; Diedre Neal and Devonte Neal, minors, by their next friends and personal representatives, Don and Joseph DePalma, Plaintiffs,**

**William Richard Kyzer and Rebecca Carol Coleman Kyzer, Plaintiffs–Appellants/Cross–Appellees,**

v.

**METROPOLITAN GOVERNMENT OF NASHVILLE and Davidson County, Tennessee, Defendant–Appellee/Cross–Appellants.**

No. 00–5566, 00–5587.

United States Court of Appeals, Sixth Circuit.

July 9, 2002.

Before NELSON, SILER, and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Plaintiffs–Appellants William Richard Kyzer and Rebecca Carol Coleman Kyzer ("the Kyzers"), the adoptive parents and next friends of minors Devonte Neal and Deidre Neal, the surviving children of the deceased Connie Neal, appeal, and Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") cross-appeals, from the district court's judgment awarding $78,520 to Connie Neal and $25,740 to each of her surviving children, Devonte Neal and Deidre Neal, in this wrongful death action against Metro. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Substantive History

This case arises from Metro's negligent response to the decedent Connie Neal's call to 911 for emergency assistance on the morning of April 14, 1997 regarding her estranged husband, Antonio Neal, who shot her to death and then killed himself, after also murdering her mother, Sandra DePalma, brother, Kenneth DePalma, and sister, Tammy DePalma. On April 13, 1997, Antonio and Connie Neal were having marital problems, prompting Connie Neal to leave with her children, Devonte and Deidre, and stay at the home of a friend in Mt. Juliet, Tennessee that night. On the following morning, Neal went to the home of her parents, Don and Sandra

DePalma, at 409 Terry Place, in Hermitage, Tennessee. Connie Neal's brother and sister, Kenneth and Tammy DePalma, also resided with their parents at 409 Terry Place.[1] Neal left her oldest child, Deidre, in Mt. Juliet and took her younger child, Devonte, with her to her parents' house, arriving at about 10:00 a.m.

At about 10:09 a.m. a 911 emergency call was made from the DePalma home to the Metropolitan Police Dispatch:

Operator: 911 Emergency

(Inaudible—male voice shouting—then a female voice—not able to understand what parties are saying.)

Male voice: (Antonio Neal—yelling— "alright, come on.")

Female voice: (Connie Neal—"ok, ok, ok, with my heart")

Antonio Neal: Ok

Connie Neal: Antonio, with my heart (inaudible), please, don't (screams), please, please.

[2 shots fired] Oh God, Antonio, please, stop, stop, please,

Antonio Neal: (Inaudible)

After the screams and two gunshot sounds were transmitted over the open 911 line, the telephone line went dead.

The 911 operator, Shirl Davis, was able to discern the address and phone number of the residence originating the call from the computer-aided dispatch system ("CAD"), and initiated a 911 "incident" and a radio call that was sent out to patrol units. Although the screams and gunshots were audible at the time of the 911 transmission, Davis claimed that she did not hear them. Thus, Davis only entered into the CAD system that "Man and woman arguing. Male subject made female subject hang up the phone." Davis also typed into the CAD system that the call was a "10-41P," or a "domestic disturbance in progress." The information was immediately sent through the CAD system to a police dispatcher. Davis also contacted the police dispatcher, Deborah Wheeler, who dispatched the call to Officers Mike Helton and John Murphy of the Metro Police Department. Both officers believed that they were responding to a routine domestic disturbance, and thus did not use speed or sirens in traveling to 409 Terry Place.

Shortly thereafter, 911 operator Davis called the DePalma residence back:

Connie Neal: Hello.

Operator: Hello, ma'am this is Miss Davis with the Metro Police.

Connie Neal: Uh, huh.

Operator: I've got the police on the way to 409 Terry Place.

Connie Neal: She's kinda busy right now, can she call you right back?

Operator: No, I'm going to send the police, okay? You live in a house or an apartment? Apartment?

Connie Neal: Well, yeah, well, I'm working for her today so I'll be up there.

Operator: Okay.

Connie Neal: —probably around (inaudible)—maybe 30 or 45 minutes.

Operator: Okay, I'll send somebody out there.

Connie Neal: Okay.

Officer Helton arrived first at the DePalma residence. After parking his car in the driveway, Officer Helton walked to the

---

1. Tammy and Kenneth DePalma, adult children of Don and Sandra DePalma, suffered from Down's Syndrome.

front door and knocked. When he did not receive a response, Officer Helton knocked again. He then opened the door and stepped inside the foyer and saw "a half a flight of stairs going straight down and a half a flight going straight up." At the top of the stairs, Officer Helton saw Antonio Neal and asked him if everything was okay. Officer Helton also asked Antonio Neal if he had called the police and what was going on. Antonio Neal replied that no one had called the police and that everything was fine. According to Officer Helton, Antonio Neal was standing with his hands behind his back. Given their respective positions and his "obvious tactical disadvantage," Officer Helton asked Antonio Neal to show him his hands. Antonio Neal made no reply to the officer's request. At that point, Connie Neal appeared from the living room holding a baby. When Officer Helton asked her if she was okay and if she had called the police, Connie Neal answered that she was okay and that she did not call the police. Glancing into the living room, Helton saw the torso of a body, with a "blood-like substance coming from the mouth," but could not determine if the body was real. Officer Helton then looked back at Antonio Neal and again asked him to show his hands. Realizing that he was in "an extremely dangerous position" if the body in the living room was real, Officer Helton, backing out the door, asked Antonio Neal to step outside onto the porch so that they could talk. Antonio Neal, using a profanity, refused. Officer Helton then left house and walked back to his patrol car to radio Officer Murphy to hurry up.

Immediately thereafter, Officer Murphy arrived. As Officer Helton was explaining the situation to Officer Murphy, Officer Phillip Sage, who also responded to the call given his proximity to 409 Terry Place, arrived at the residence. After informing Officer Sage about the situation as well,

Officer Helton radioed police dispatcher Wheeler to request that she call the residence back to get more specific information about the problem inside the house.

At 10:33 a.m. Wheeler called the DePalma residence and, after identifying herself as being with the police department, spoke with Connie Neal. According to Wheeler, she established that "everything [was] not all right" inside the house. Wheeler also informed Connie Neal that the police were outside. Wheeler then radioed Officers Helton and Murphy to tell them about her conversation with Connie Neal and to inform them about a problem inside the house. The officers also were told that Connie Neal could not talk freely on the phone and that she pretended that the dispatcher was her employer during their conversation.

The officers then decided to approach the residence, realizing that Connie Neal was in serious danger. As the officers were about to enter the house, six to twelve gunshots rang out from inside the house. Officer Murphy immediately radioed dispatch to say "shots fired" and to request more patrol cars be sent, as well as the SWAT team and hostage negotiators. Once the SWAT team arrived, they conducted a sweep of the premises, finding the bodies of Connie Neal, Sandra DePalma, Tammy DePalma and Kenneth DePalma inside the residence. Connie Neal's ten-month old son Devonte Neal was uninjured. Antonio Neal, unconscious from a bullet wound to his head, was transported to the emergency room of the Vanderbilt Medical Center, where he died several days later on April 17, 1997.

## B. Procedural History

Plaintiffs filed suit on April 13, 1998 against Metro and Officers Helton, Murphy and Sage, 911 operator Davis and

police dispatcher Wheeler, individually and in their official capacities. The DePalma Plaintiffs sought damages for the wrongful deaths of their family members, claiming a violation of 42 U.S.C. § 1983, and alleging state-law tort claims of common-law negligence, negligence per se and reckless misconduct. After the suit was filed, Connie Neal's surviving minor children, Diedre and Devonte, were formally adopted by the Kyzers. Thereafter, on December 21, 1998, the district court entered an order granting in part and denying in part Defendants' motion to dismiss, denying Defendants' motion to dismiss Plaintiffs' § 1983 claim against Metro, but granting their motion to dismiss Plaintiffs' claims against Davis, Helton, Murphy, Sage and Wheeler in their official capacities. Subsequently, the Kyzers, after being substituted as the proper party representatives for Connie Neal's surviving children, filed a motion to amend the complaint to include claims for loss of parental consortium, which the district court granted on May 4, 1999.[2]

After discovery was completed, Metro filed a motion for summary judgment on May 17, 1999, claiming, in pertinent part, that Metro could not be found liable on the basis of the "public duty doctrine." On December 18, 1998, the district court granted summary judgment on all claims, except Plaintiffs' § 1983 equal protection, negligence, negligence per se, and reckless misconduct claims against Metro, finding that the "special duty exception" to the public duty doctrine applied in this case. The district court thus dismissed the remaining claims against Davis, Helton, Murphy, Sage and Wheeler.

The case proceeded to trial in August of 1999 on Plaintiffs' claims against Metro. By agreement, the federal civil-rights claims were tried to a jury, and the state-law tort claims were tried to the court. Following a seven-day trial, the jury returned a verdict on August 20, 1999 in favor of Metro on Plaintiffs' federal civil rights claims. Four days later, on August 24, 1999, the district court rendered its decision on the state-law tort claims, finding in favor of Metro, except for Plaintiffs' negligence claim asserted on behalf of Connie Neal. Specifically, the district court found that 911 operator Davis and police dispatcher Wheeler were negligent, and that, as a result, Connie Neal suffered damages in the amount of $915,000. The district court further determined that Antonio Neal was responsible for 90% of Connie Neal's damages, and that Metro was at fault for 10%. On September 10, 1999, the district court entered a judgment in favor of Connie Neal against Metro in the amount of $91,500. In addition, the district court found that Connie Neal's minor children, Diedre and Devonte, each suffered $300,000 in damages for loss of consortium. As to these claims, the district court, again finding that Metro was only liable for 10% of these damages, awarded each child $30,000 against Metro. The district court thus entered a judgment on September 10, 1999 against Metro in the total amount of $151,000.

Afterwards, both the Kyzers and Metro filed motions to alter or amend the judgment under Rule 50 of the Federal Rules of Civil Procedure. The Kyzers sought to increase the award to $350,000, while Metro sought to decrease it to $130,000 under the Tennessee Governmental Tort Liability Act ("GTLA"). Tenn.Code Ann. § 29–20–201(a) (2000). In ruling on these motions, the district court reduced the amount of the judgment against Metro in favor of Connie Neal and her two children to the statutorily prescribed limit of

---

2. We note that this Court's docket sheet does not reflect this substitution.

$130,000 under the GTLA. The damages award was apportioned as follows: 60.4% to Connie Neal; 19.8% to Devonte Neal; and 19.8% to Diedre Neal. Thus, of the total judgment of $130,000, $78,520 was awarded to Connie Neal, and $25,740 was awarded to each of her surviving children, Devonte Neal and Deidre Neal. The Kyzers filed a timely appeal, and Metro a cross-appeal.

## II. DISCUSSION

**The Kyzers' Direct Appeal**

■ On appeal, the Kyzers argue that the district court erred by limiting the maximum judgment against Metro to $130,000. This Court reviews the district court's determination of state law *de novo*. *See Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir.1997).

The Tennessee Governmental Tort Liability Act ("GTLA") states that all governmental entities are immune from suit except where otherwise provided within the GTLA. Tenn.Code Ann. § 29–20–201(a) (2000). Under this statute, governmental entities are immune from suits arising from the exercise and discharge of any of the entity's functions, whether governmental or proprietary. In addition, for suits that are allowed, the liability of the governmental entity is capped at $130,000.00 per individual and $350,000.00 per "accident, occurrence, or act." Tenn.Code Ann. § 29–20–403(b)(2)(A).

In *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 598 (Tenn.1999), the Tennessee Supreme Court, interpreting the state's wrongful death statute, Tenn.Code Ann. § 20–5–113, permitted parental consortium damages, holding that loss of parental consortium is not a separate claim for the child, but constitutes an element of the deceased parent's claim. In *Hill v. City of Germantown*, 31 S.W.3d

234, 240 (Tenn.2000), the Tennessee Supreme Court, reaffirming *Jordan* that "loss of consortium damages in a wrongful death claim are wholly contained within the award for wrongful death," held that $130,000 is "the maximum allowable award under the GTLA per injured person," and that "[l]oss of consortium damages could not increase the total amount of the award." *Id.* at 240. *See also Lynn v. City of Jackson*, 63 S.W.3d 332, 335–36 (Tenn. 2001) (stating that *Jordan* and *Hill* held that "Tennessee's wrongful death statute does not create a new cause of action for the beneficiaries but instead preserves the right of action of the decedent").

In this case, Connie Neal was the sole Plaintiff with an independent claim against Metro. Under Tennessee law, the consortium claims of her children, Diedre and Devonte Neal, are not considered separate causes of action. Because loss of consortium damages cannot increase the total amount of the award, $130,000 is "the maximum allowable award under the GTLA per injured person." *Hill*, 31 S.W.3d at 240. Thus, the district court did not err in limiting the maximum judgment against Metro to $130,000.

**Metro's Cross–Appeal**

■ On cross-appeal, Metro argues that the actions of its 911 operator Davis and police dispatcher Wheeler were not, as a matter of law, the cause-in-fact or the proximate cause of Connie Neal's death.

■ A claim for negligence under Tennessee law requires that a plaintiff establish the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn.1997). In *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn.1998), the

Tennessee Supreme Court discussed the relationship between "causation in fact" and "proximate causation" in the following terms:

> The distinction between cause in fact and proximate, or legal, cause is not merely an exercise in semantics. The terms are not interchangeable. Although both cause in fact and proximate, or legal, cause are elements of negligence that the plaintiff must prove, they are very different concepts. Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for the conduct. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient.

975 S.W.2d at 529 (quoting *Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252, 256 n. 6 (Tenn.1997)) (citations and quotation marks omitted). The Tennessee Supreme Court explained the concept of proximate cause in *Haynes v. Hamilton County*, 883 S.W.2d 606, 611–12 (Tenn.1994):

> This Court has previously held that in Tennessee, a three-pronged test for proximate cause is applied: (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there

is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

883 S.W.2d at 611–12 (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)) (internal citations and quotation marks omitted.) *Haynes* also explained that "[t]here is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result." *Id.*

As the trier of fact of Plaintiffs' state-law claims, the district court found that Metro breached its duty to act reasonably in answering the 911 emergency call through the failure of its 911 operator Davis and police dispatcher Wheeler to obtain all the necessary information about the seriousness of the situation when talking with Connie Neal and to pass that information to the police officers who responded to the police dispatch. The district court also found that the breach of duty caused Connie Neal's death. As to whether Plaintiffs established causation-in-fact, the district court made the following findings.

> Of course we will never know with any certainty whether the tragic events on April 14, 1997 would have been prevented had the emergency communications operators acted consistent with the standard of care and all of the procedures set forth by the Metropolitan Government. However, the Court finds that plaintiffs have proven by a preponderance of the evidence that the situation would have ended differently had the police officers been given the informa-

tion necessary to respond to the situation quickly and with backup force.

The evidence presented at trial suggests that had the officers known that shots had been fired, Officer Helton would have waited to enter the residence at least until his backup arrived. Also, the officers would approach the residence with caution with their bullet-proof vests on and with their weapons drawn.

Further, it is entirely likely that the SWAT team and a negotiator would have been called to the scene quickly. The undisputed testimony presented at trial indicates that use of such tactics would have had a good chance of preventing the tragedy that took place.

Given such testimony and the other evidence in the case, the Court finds that the emergency communication operator's failure to follow the procedure was a but for cause of Connie Neal's death.

On appeal, Metro claims that, under *White,* causation-in-fact was not established as a matter of law because "the trial court was merely speculating when it concluded that if the Emergency Communications operators had provided better information to the police officers then the tragedy of Connie Neal's death would not have occurred." Metro Br. at 37. We disagree. Findings of fact shall not be set aside unless clearly erroneous. Fed. R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746·(1948). This Court may not reverse the district court's findings of fact if the district court's account of the evidence is plausible in light of the record

viewed in its entirety, even though this Court would have weighed the evidence differently if it had been sitting as the trier of fact. *Henry v. Lennox Indus., Inc.,* 768 F.2d 746, 750 (6th Cir.1985). Although causation cannot be based upon speculative or conjectural proof, *see Hill v. Eagle Bend Mfg., Inc.,* 942 S.W.2d 483, 487 (Tenn.1997), there was sufficient evidence in the record to permit the district court, as the trier of fact, to reasonably infer that Connie Neal's death would not have occurred but for the negligent conduct of 911 operator Davis and police dispatcher Wheeler.

Further, applying the three-factor test as set forth in *Haynes,* the district court did not err in finding that there was sufficient evidence that the 911 operator and police dispatcher proximately caused Connie Neal's death. Specifically, the district court found that Metro's actions were a "substantial factor" in Connie Neal's death because "the use of the SWAT team or a negotiator likely would [have led] to a favorable result," and that " if additional backup [had] entered the house with [Officer Helton] under these circumstances, the likelihood is even greater that they would have protected Connie Neal." Although Metro argues that it is "sheer speculation" to assume that the police would have responded differently, and hence prevented Connie Neal's death, if the 911 operator and police dispatcher had provided the police officers with the information necessary to respond to the situation quickly and with backup force, the evidence adduced at trial was sufficient to allow the district court, as the trier of fact, to conclude that their negligent conduct was a substantial factor in producing Connie Neal's death because the officers would have reacted differently if they had been immediately apprised of the seriousness of the danger facing Connie Neal and her

family members. Accordingly, the district court did not err in finding that Metro caused in fact and proximately caused the death of Connie Neal.

Metro also claims that the district court erred in applying the "special duty exception" to the public duty doctrine in this case. In *Ezell v. Cockrell*, 902 S.W.2d 394, 402 (Tenn.1995) (quoting *Bennett v. Stutts*, 521 S.W.2d 575, 576 (Tenn. 1975)), the Tennessee Supreme Court adopted the "special duty exception" to the public duty doctrine, concluding that "a special duty of care exists when (1) officials, by their actions, affirmatively undertake to protect the plaintiff, and the plaintiff relies upon the undertaking; (2) a statute specifically provides for a cause of action against an official or municipality for injuries resulting to a particular class of individuals, of which the plaintiff is a member, from failure to enforce certain laws; or (3) the plaintiff alleges a cause of action involving intent, malice, or reckless misconduct." 902 S.W.2d at 402.

In this case, the district court applied the first condition of the special duty exception outlined in *Ezell*, finding that Metro affirmatively undertook to protect Connie Neal. Specifically, the district court found that when 911 operator Davis called the DePalma residence back, after the first telephone call, she determined that there was a problem and "assured Connie Neal three separate times that the police were on the way." Based upon these circumstances, Officer Helton entered the home, but exited soon thereafter, realizing the gravity of the situation. Immediately thereafter, at Officer Helton's request, police dispatcher Wheeler called Neal to tell her that the police were outside the house and that they would be told that she was not okay. Given the facts and circumstances surrounding Connie Neal's death, the district court did not err in concluding that Metro undertook a special duty to assist her, finding that she relied upon the 911 system to provide assistance.

Finally, the district court did not err as a matter of law in finding that *Turner v. Jordan*, 957 S.W.2d 815 (Tenn. 1997) did not allow for the comparison of Metro's negligence with the intentional conduct of Antonio Neal in allocating the damages awarded to Plaintiffs in this case. In *Turner*, the Tennessee Supreme Court held that "the conduct of a negligent defendant should not be compared with the intentional conduct of another in determining comparative fault where the intentional conduct is the foreseeable risk created by the negligent tortfeasor." *Id.* at 823. Under this rule, a negligent defendant may be found 100% at fault for the injuries sustained by a victim as a result of another's intentional act. Thus, the district court did not err in finding that Metro was 100% liable for the damages awarded to Plaintiffs.

## CONCLUSION

Accordingly, we find that the district court did not err in limiting the maximum judgment against Metro to $130,000. The district court also did not err in finding that Metro caused in fact and proximately caused the death of Connie Neal, after having undertaken a duty to assist her under the special duty exception to the public duty doctrine. Finally, the district court did not err in finding that Metro was 100% liable for the damages awarded to Plaintiffs. Based upon the foregoing, the district court's judgment is **AFFIRMED.**