## IN THE COURT OF APPEALS OF TENNESSEE,
### AT NASHVILLE

**FILED**

**February 9, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

|  |  |  |
|---|---|---|
| **PAMELA L. SCHENK**, | ) | Wilson County Circuit Court |
|  | ) | No. 9262 |
| Plaintiff/Appellee. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 01A01-9804-CV-00190 |
|  | ) |  |
| **RAYMOND D. LANE**, | ) |  |
|  | ) |  |
| Defendant/Appellant. | ) |  |
|  | ) |  |

From the Circuit Court of Wilson County at Lebanon.
**Honorable Bobby H. Capers, Judge**


**Keene W. Bartley**,
SCHULMAN, LeROY & BENNETT, P.C., Nashville, Tennessee
Attorney for Defendant/Appellant.


**Michael R. Jennings**, Lebanon, Tennessee
Attorney for Plaintiff/Appellee.


OPINION FILED:

**AFFIRMED AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J.,W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Defendant Raymond D. Lane appeals a jury verdict awarding $297,000.00 to Plaintiff Pamela L. Schenk for injuries sustained as a result of an automobile accident occurring between Lane and Schenk. For the reasons set forth below, we affirm in all respects.

### *Factual and Procedural History*

On September 21, 1988, Schenk and Lane were involved in an automobile accident on Mt. Juliet Road in Wilson County, Tennessee occurring between 6:30 and 7:00 p.m. Where the collision occurred, Mt. Juliet Road is a five lane highway with two northbound lanes, two southbound lanes, and one center turning lane. Schenk was driving her Chevrolet Cavalier north on Mt. Juliet Road. Lane was driving his Chevrolet pickup truck east on Interstate 40 and had just taken the Mt. Juliet Road Exit. Lane stopped at the stop sign at the end of the exit ramp and then proceeded to make a left turn across the two northbound lanes of Mt. Juliet Road. After noticing Lane's vehicle, Schenk slammed on her brakes and changed to the outer northbound lane. Schenk was able to avoid Lane's truck but collided with the eighteen foot trailer that Lane was pulling behind the truck. The accident was witnessed by Jimmy Chafin, who was traveling northbound on Mt. Juliet Road immediately behind Schenk and John Steele, who was exiting I-40 at Mt. Juliet Road behind Lane.[1]

Following the accident, Schenk was taken to the emergency room where she was treated for a "busted" mouth, a chipped tooth, scratches on her chin and forehead, and a "big bump" where Schenk collided with her rear view mirror. She was x-rayed, given muscle relaxants, and released that same evening. For approximately two weeks following the accident, Schenk was sore "from head to toe." Beyond this two week period, Schenk experienced persistent pain and soreness in her hips that eventually proceeded down to her legs. In early 1989, Schenk consulted Dr. Mark Houston regarding this continued pain. After conducting tests, Dr. Houston advised Schenk that there was nothing wrong with her and that she needed to relax. Approximately two months later, Schenk sought a second opinion from Dr. Stein, who took x-rays and a CT scan of Schenk and then

---

[1]Schenk testified that, at the time of the impact, Lane's truck and trailer were both positioned across her lane of traffic. Lane and Steele, however, both testified that Lane's truck was in the center turning lane and that his trailer was positioned across the inside northbound lane at the time of the collision.

informed her that she had a ruptured disk in her lower back. Dr. Stein suggested that Schenk undergo back surgery but Schenk decided against this option. Instead, Schenk underwent a limited amount of physical therapy and took mild muscle relaxants prescribed by Dr. Stein.

In 1991, Schenk was examined by Dr. Dan Spengler, an orthopedic surgeon. Dr. Spengler prescribed anti-inflammatory drugs and ordered approximately six weeks of physical therapy. Because these efforts did little to decrease her pain, Schenk reconsidered the option of surgery. Dr. Spengler performed a bilateral partial diskectomy on Schenk in October of 1991. She was released from the hospital three days after the procedure and was able to return to work on a part-time basis with some restrictions one month later. During this one month period, Schenk underwent further physical therapy.

In late 1992, Schenk began experiencing pain in her lower back and through her hips. She returned to Dr. Spengler, who ordered more physical therapy and gave Schenk a steroid injection to decrease inflammation in these areas. Schenk was also examined by Dr. Vaughan Allen, who referred Schenk to Dr. Leon Ensalada, a pain medicine specialist. Dr. Ensalada performed several procedures on Schenk, including two more steroid injections, three nerve blocks, and a facet rhizotomy.[2] According to Dr. Ensalada, when Schenk reaches maximum medical improvement, she will still retain a permanent partial impairment of the whole person. Dr. Spengler testified that, under the American Medical Association Guidelines, Schenk would receive a permanent partial impairment rating of approximately eight to ten percent. Both Dr. Ensalada and Dr. Spengler agreed that Schenk's injuries may require further medical treatment but were unable to estimate the costs of such treatment.

Schenk filed a complaint against Lane seeking damages for personal injuries sustained as a result of the accident. On the day of trial, Lane filed a motion in limine, requesting that certain medical bills be excluded for lack of foundation. The trial court granted the motion with respect to one of these bills but ruled that the remaining bills were admissible, provided that counsel

---

[2]A facet rhizotomy is a procedure that destroys the nerves in the joints where the patient is experiencing pain. By destroying the nerves, the discomfort experienced by the patient in these joints is lessened.

for Schenk supplemented the record with affidavits laying a foundation for the bills. At the conclusion of the trial, the jury found that Schenk was responsible for one percent of the negligence causing the accident, that Lane was responsible for ninety-nine percent of the negligence causing the accident, and that Schenk had sustained a total of $300,000.00 in damages as a result of the accident. Consistent with this finding, the trial court granted a judgment in favor of Schenk in the amount of $297,000.00. Lane filed a motion for new trial, arguing in part that the trial court should not have allowed certain medical records to be admitted into evidence. The trial court denied Lane's motion for a new trial but agreed these documents were erroneously admitted into evidence and consequently reduced the amount of the judgment by $9,861.75. Lane appeals the findings of the jury as well as the trial court's denial of his motion for new trial.

### *Issues*

The issues asserted on appeal, as stated by Lane, are as follows:

1.      The appellee was allowed to enter testimony of lost work and substantial medical proof that was not appropriately established by expert testimony. The evidence was not supplied to the appellant in a timely manner and was admitted over the objections of the appellant in his motion in limine and in open court.

2.      In reaching a verdict, the jury clearly disregarded the facts as to how the accident occurred and did not act in a thoughtful manner in assessing liability between the parties. The determination of negligence being 99% the fault of the defendant was clearly arbitrary and capricious by the jury and is not supported by material evidence.

3.      The jury disregarded the medical testimony and failed to account for the second injury that occurred to the appellee subsequent to the accident. The jury's verdict clearly reflects their disregard of the instructions of the Court as to proximate cause and a disregard of the medical proof.

4.      The Court improperly did not allow the appellant to argue the extrapolation of the distance and time which would have elapsed between when the appellee first saw the appellant and when the impact occurred.

5.      The Court erred in refusing to grant a new trial.

### *Lost Wages*

Lane first contends that the trial court erred in allowing Schenk to testify regarding lost wages. On direct examination, Schenk testified that she is employed full time as a respiratory therapist and earns $13.23 per hour plus a $1.90 shift differential for working nights. Over the objection of counsel for Lane, Schenk further testified as follows:

Q. I think I was asking you about the lumbar facet procedures?

A. Yes, sir.

Q. And you went home the same day that you had them?

A. Yes, sir.

Q. Were you able to go back to work the next day?

A. I was usually down for about a week with them. I usually missed two or three days of work.

Q. With the rhizotomy, it was a procedure that was done the same day?

A. Yes, sir.

Q. Were you able to go back to work the next day?

A. No, sir.

Q. How long was it before you could go back to work on that?

A. I believe I was back in a week after that one, also.

Q. Has there ever been a period of time when you missed an extensive -- or did not work for a period of time?

A. Yes, sir, in 1993.

Q. How long was that?

A. Approximately five months.

During closing arguments, counsel for Schenk reminded the jury that Schenk missed work after undergoing these medical procedures and specifically asked the jury to compensate Schenk for future lost wages. Finally, in charging the jury, the trial judge explained that Schenk has "made a claim for loss of earnings which is the value of the earnings that have been lost in the past as a result of this accident and those that will be reasonably certain to be lost in the future as a result of this injury."

Under Tennessee law, lost wages are generally recoverable as an element of damages in a personal injury action. ***See, e.g., Benson v. Tennessee Valley Elec. Co-Operative***, 868 S.W.2d 630, 640 (Tenn. App. 1993). In the instant case, however, Lane contends that it was improper to allow Schenk to testify regarding wages lost as a result of her injuries and to allow Schenk's counsel to refer to lost wages during closing arguments. In support of this position, Lane alleges that, in response to interrogatories, Schenk stated that she would not be seeking damages for lost wages. Counsel for Lane complains that he was not informed of Schenk's intention to seek lost wages until February 18, 1997, the day before the trial, when he received a fax from Schenk's attorney stating that Schenk would be seeking $17,226.08 in wages lost as a result of her injuries. Unfortunately, we are unable to examine the response to interrogatories referred to by Lane because this document has not been included in the record submitted to us on appeal. It is the responsibility of the party seeking review to have prepared an adequate appellate record. ***See State v. Banes***, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). Unless supported by evidence in the record, we cannot rely on the mere statements of counsel to establish what may or may not have been stated in a document filed with the trial court. ***See State v. Thompson***, 832 S.W.2d 577, 579 (Tenn. Crim. App. 1991). We also note that the complaint sought recovery for loss of wages and impairment of earning capacity. Based on the record before us, we do not find that Schenk has waived her right to recover lost wages. Thus, we hold that the trial court properly allowed testimony and argument regarding this element of damages.

### *Medical Bills Incurred After February 16, 1994*

Lane also argues that the trial court erred in allowing the admission of certain medical bills and further allowing Schenk to testify regarding these bills. Dr. Ensalada, one of the physicians who treated Schenk, was deposed on February 16, 1994. In his deposition, Dr. Ensalada testified that Schenk may be required to undergo future medical treatment. Dr. Ensalada stated that Schenk's future course of treatment was dependant on her response to current treatment. He added, however, that if Schenk's symptoms return, she may become a candidate for a procedure called a facet rhizotomy. Schenk continued to be treated by Dr. Ensalada after the taking of his deposition, undergoing a facet rhizotomy and two additional nerve blocks.

Lane filed a motion in limine seeking to exclude, among other things, the medical bills of Dr. Ensalada associated with these procedures and the bills of the hospitals where the procedures were performed. The trial court ruled that these bills were admissible so long as Schenk obtained and filed affidavits from the custodian of records at the hospitals where the procedures were performed.[3] The trial court then allowed Schenk to testify regarding the procedures performed by Dr. Ensalada subsequent to the taking of his deposition. Although the trial court did not allow Schenk to testify regarding the technical aspects of the procedures, she was allowed to describe the pain associated with each procedure and state the amounts of the medical bills received from Dr. Ensalada and the hospitals where these procedures were performed.

After the jury rendered its verdict, Lane filed a motion for new trial alleging in part that Schenk should not have been allowed to testify regarding the treatment she received from Dr. Ensalada subsequent to the taking of his deposition. The trial court agreed that this evidence was improperly admitted and consequently reduced the amount of the judgment by $9,861.75.[4] In light of this ruling, it is unclear why Lane now complains about the admission of this evidence. Schenk's testimony regarding these procedures was relevant only to the amount of her damages and had no bearing with respect to the jury's finding of liability. Assuming that the trial court should not have allowed this testimony, the proper remedy would not have been to order a new trial. Rather, under such circumstances, the trial court should have reduced the jury's findings with respect to damages. This is precisely what the trial court did in this case. Thus, we find that Lane's argument regarding this issue is without merit.

***The Jury's Assignment of Liability and Assessment of Damages***

At the conclusion of the trial, the jury found that Schenk was responsible for one

_____

[3]Schenk filed these affidavits on February 20, 1997, the day following the trial.

[4]In its order modifying the judgment, the trial judge did not specify precisely which bills were admitted in error. Rather, the court simply indicated that the $9,861.75 total represented the sum of medical bills of Dr. Ensalada totaling $3,602.00, bills of Centennial Medical Center totaling $1,295.75, and bills of Memorial Hospital totaling $4,964.00. During the trial, however, it appears that the disputed items totaled only $3,876.67. Although Schenk appears to recognize this consistency, she has not requested that we alter the amount of the judgment in any way. Thus, we make no finding with respect to this matter.

percent of the negligence causing the accident and that Lane was responsible for ninety-nine percent of the negligence causing the accident. Lane contends that "the jury acted with arbitrariness and caprice" and "disregarded the facts and circumstances leading up to the accident" in comparing the fault of the parties. Under the appropriate standard of review, a jury's findings with respect to liability may be set aside only if they are unsupported by material evidence in the record. *See, e.g., Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997)(citing T.R.A.P. 13(d)).

The facts in the instant case are largely undisputed. Lane attempted to make a left turn across the two northbound lanes of Mt. Juliet Road, pulling an eighteen foot trailer behind him. Jimmy Chafin, a disinterested witness who was traveling directly behind Schenk, testified that both he and Schenk were "moseying" along "at a reasonable rate of speed." Chafin further testified that, after Lane pulled out in front of them, both he and Schenk slowed down. Schenk testified that she attempted to avoid Lane's vehicle by changing to the outside lane and slamming on her brakes. This is consistent with the testimony of Chafin, who recalled seeing Schenk's brake lights immediately prior to the collision.

In support of his argument that the jury's assessment of liability was arbitrary and capricious, Lane emphasizes certain testimony regarding whether Schenk had her headlights on at the time of the accident. The accident occurred sometime between 6:30 and 7:00 p.m. Schenk testified that she was certain that her parking lights were on but that she was unsure whether she had also turned on her headlights. Chafin, who witnessed the accident from behind Schenk, testified that Schenk's back lights were on. Lane, however, testified that he looked both ways before turning and did not see any headlights of approaching vehicles.

Based on the aforementioned testimony, we find that there is ample evidence in the record to support the jury's assignment of fault. We thus uphold the jury's finding with respect to this matter.

The issues on appeal, as stated by Lane, do not involve a challenge to the jury's assessment of Schenk's damages. Nevertheless, Lane argues in his appellate brief that the damages awarded in the instant case were excessive. Under Tennessee law, there are no mathematical rules

for computing damages in negligence cases. *See, e.g., **Brown v. Null**, 863 S.W.2d 425, 429-30 (Tenn. App. 1993)(citing **Smith v. Bullington**, 499 S.W.2d 649 (Tenn. App. 1973)). An injured plaintiff is entitled to compensation for bodily injuries, pain and suffering, permanent impairment or disability, lost wages, loss of earning capacity, and expenses incurred as a result of the defendant's negligence. *See id.* at 430. The amount of damages to be awarded in such cases is primarily within the discretion of the jury. *See, e.g., **Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.**, 919 S.W.2d 36, 42 (Tenn. App. 1995)(citation omitted). As noted above, findings of a jury may not be disturbed unless there is no material evidence in the record to support the jury's determination. *See, e.g., **Turner**, 957 S.W.2d at 824 (citing T.R.A.P. 13(d)).

Prior to trial, the parties stipulated that Schenk incurred medical expenses totaling $31,828.31. Schenk testified that, immediately following the accident, her head and jaw were very sore. Schenk further testified that she felt terrible for approximately two weeks after the accident, describing the pain as follows: "It was pretty much head to toe. My neck, my head, my shoulders, my chest. It felt I had been through a blender. I was so sore." She also described an ongoing tenderness and soreness that developed in her hips and traveled down her legs. Although this pain subsided after Schenk's 1991 surgery, Schenk began experiencing pain in her lower back and through her hips in late 1992. Thereafter, Schenk underwent a variety of medical procedures that she described as painful. After each of these procedures, Schenk was unable to return to work for approximately one week. Both Dr. Spengler and Dr. Ensalada agreed that Schenk's injuries may require further medical treatment. Dr. Spengler added that, as a result of her injuries, Schenk has an eight to ten percent permanent partial impairment of the whole person. At the time of trial, Schenk was twenty-nine years old. By judicial notice, the trial court recognized that the life expectancy of a twenty-nine year old female is 47.97 years.

The jury in the instant case found that Schenk had sustained a total of $300,000.00 in damages. In ruling on Lane's motion for a new trial, the trial judge reduced this figure by $9,861.75, the total of certain medical bill that were erroneously admitted into evidence. In light of the aforementioned testimony, we find that there is material evidence in the record to support a finding that Schenk sustained damages totaling $290,138.25. We therefore uphold the jury's assessment of Schenk's damages.

*Causation*

Lane contends that there is no causal connection between the September 1988 automobile accident and the pain experienced by Schenk subsequent to her October 1991 back surgery. Rather, he argues that these injuries were caused by Schenk's use of an aerobic exercise video. During her first visit with Dr. Ensalada, Schenk complained of pain in her hips and lower back. According to Dr. Ensalada, Schenk explained that she first noticed this pain in late 1992 while working out with an aerobic exercise video. Schenk testified, however, that although she may have mentioned using an exercise tape to Dr. Ensalada, she did not injure herself while participating in this activity. Regarding the relationship between the use of this video and Schenk's symptoms, Dr. Ensalada testified in pertinent part as follows:

> Q. I believe in your testimony you had stated that in your opinion these injuries for which you were presented, or complaint for which you were presented by Ms. Schenk, I think the term you used, they were related to the accident. I believe also you stated you have reviewed Dr. [Spengler's] notes and deposition; is that correct?
>
> A. Yes, sir.
>
> Q. Were you given the notes in Dr. [Spengler's] file regarding the therapy that Ms. Schenk underwent?
>
> A. Yes, sir.
>
> Q. Do you disagree with Dr. [Spengler's] characterization of his surgery as achieving a good result?
>
> A. From the history I got from Ms. Schenk, she initially had resolution of her symptoms, which would be an early, good surgical result. But then she had a later exacerbation of her symptoms.
>
> Q. As I understand it, exacerbation from Dr. [Spengler's] notes were that this exacerbation was caused by her utilizing an aerobic workout tape; is that correct by your reading of the notes?
>
> A. She, in fact, told me the first time she was here she had been working out. That's when she first had that exacerbation of her painful symptoms.
>
> . . . .
>
> Q. I believe you testified in response to a question on cross-examination that the facet dysfunction is not unusual in this type of case?
>
> A. Correct.

Q. Is there anything unusual about making a diagnosis of facet dysfunction after a herniated disc has been removed from the patient's back?

A. No.

. . . .

Q. You have testified previously on direct that the problems for which you were treating Ms. Schenk, and you have reviewed Dr. [Spengler's] deposition and his notes, and you said that they were related to the September 21, 1988 accident?

A. Yes.

Q. You are not changing your opinion on that?

A. No. The way in which they are related is that the problem I'm treating Ms. Schenk for now are apart and partial [sic] to what she was treated for by Dr. [Spengler]. That's how it's related to the accident. I couldn't say with a reasonable degree of medical certainty whether or not something happened to the facet joint in the accident. What I can say is that certainly -- I've already testified that to a reasonable degree of medical certainty they are related, but they are related in that kind of linear fashion back to the fact that she had to have spine surgery for the accident. That's what I can fairly say, I think.

. . . .

Q. Going on the last statement you made in talking about a linear progression of Ms. Schenk, as I understand your testimony, that the facet problem has arisen, in your opinion, as a result of the fact that she had previously had back surgery prior to your treatment of her?

A. Yes.

Q. The actual injury to the facet or aggravation of the facet joints arose subsequent to that surgery; is that correct, by your understanding looking at her history?

A. My understanding of it is that would be a fair thing to say.

Q. If I understand facet aggravations, there has to be some physical action associated with causing the aggravation of the facet joints; is that correct?

A. Correct.

. . . .

Q. But I guess the causative affect of her condition is something that has occurred since she had the surgery? Because if I understand your testimony, it's your understanding that the back surgery made her more susceptible for facet aggravation or facet injury?

A. Right.

Q. And something she has done subsequent to having that back surgery is what has caused her to present you the symptoms for which you have treated her?

A. I think it would be fair to characterize it that way. The other side of the coin on that is that somebody her age and physical condition, if she hadn't had the surgery given the history she presented to me of her normal activities of daily living, she never would have had a facet problem, sounds like to me. So, yes, the surgery altered to some degree her normal anatomy and she subsequently developed this other problem, which I think would be unlikely to develop in somebody her age and physical condition doing the things that she described doing?

Q. What did she describe doing?

A. Just normal activities of daily living. For instance, when she presented and said that she was doing the aerobics with the videotape. A young woman, thin, in pretty good physical condition, I don't think would develop a facet syndrome doing something like that if it wasn't something else, in her instance the surgery that proceeded.

In order to recover under the theory of negligence, a plaintiff must show the negligence of the defendant was both a cause in fact and a proximate cause of his or her injuries. *See, e.g., Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)(citations omitted). A defendant's negligence is a cause in fact of the plaintiff's injuries if, but for the defendant's conduct, the plaintiff's injury would not have occurred. *See, e.g., Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252, 256 n.6 (Tenn. 1997)(citing *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). Proximate causation, on the other hand, exists when (1) the defendant's conduct was a substantial factor in bringing about the plaintiff's injuries, (2) there is no rule or policy relieving the defendant from liability, and (3) it was reasonably foreseeable that defendant's conduct might result in the plaintiff's injuries. *See, e.g., McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)(citations omitted). In order to be a proximate cause, the conduct of the defendant does not necessarily have to be the sole cause, the last act, or the act occurring closest to the onset of the plaintiff's injury, so long as there is a sufficiently close causal relationship between the conduct and the injury. *See McClenahan*, 806 S.W.2d at 775; *Mansfield v. Colonial Freight Sys.*, 862 S.W.2d 527, 532 (Tenn. App. 1993); *Solomon v. Hall*, 767 S.W.2d 158, 161 (Tenn. App. 1988).

In the instant case, Dr. Ensalada testified that there is a linear relationship between the September 1988 accident and the pain experienced by Schenk subsequent to her October 1991 surgery. He further testified that Schenk's injury typically occurs in people, like Schenk, who have previously undergone back surgery. Dr. Ensalada went on to say that, absent such a surgery, it is unlikely that a person of Schenk's age and physical condition would develop such an injury. In light

of this testimony, we find that there is material evidence in the record suggesting that Lane's negligence was both the cause in fact and the proximate cause of the pain experienced by Schenk after her October 1991 surgery.

*Closing Arguments*

During closing arguments, counsel for Lane attempted to argue that Schenk had sufficient reaction time to avoid Lane's vehicle. An exchange took place between counsel and the trial judge as follows:

Counsel for Lane: Miss Schenk testified she was on this end of the bridge. There's 250 feet. And I had her draw the bridge above it. And she acknowledged all that, the bridge between her and Mr. Lane.

Now, Miss Schenk testified she was traveling 45 miles an hour. That extrapolates out to 66 feet a second. In other words, in a second of time, her car would have gone 66 feet.

Counsel for Schenk: I'm going to object to that, Judge. There's no basis for that in the record. Nobody has testified to that, and I don't think --

The Court: I sustain the objection.

Counsel for Lane: Your Honor, if I may, I submit that that's just math.

The Court: What's that?

Counsel for Lane: You divide 5,280 feet a second . . .

The Court: Ladies and gentlemen, that may or may not be the case, but we can't argue anything that's

not in front of you at this point in time. All we can argue is matters that, in fact, evolved as testimony.

So go ahead.

Lane now contends that the trial judge erred in sustaining the objection. Specifically, Lane argues that the calculation of Schenk's reaction time is a matter of "simple mathematics" of which the trial judge could have taken judicial notice.

We agree that it is not improper to argue the mathematical formula of "Rate x Time = Distance." The testimony was varied concerning both Schenk's rate of speed and the distance between the location where she first noticed Lane's vehicle and the location of the collision. Schenk testified that she thought that the speed limit on Mt. Juliet Road was between thirty-five and forty-five miles per hour and that she was traveling within the speed limit. When questioned about her rate of speed immediately preceding the collision, however, Schenk responded that she had no idea how fast she was going. Chafin, who was traveling northbound on Mt. Juliet Road directly behind Schenk, testified that both he and Schenk were "moseying" along "at a reasonable rate of speed." Additionally, Schenk testified that she first noticed Lane's vehicle as she approached the bridge on Mt. Juliet Road. Lane testified that, subsequent to the accident, he measured the distance between the southern end of the bridge and the end of the exit ramp, the point from which he began to turn left onto Mt. Juliet Road. When asked about this distance, Lane stated that the length of the bridge is "approximately two hundred -- 350 foot" and that the end of the exit ramp is "20-something-foot past the bridge itself." When asked by counsel for Schenk if this distance was 200 feet, Lane nodded affirmatively and then stated that it was about 250 feet. Lane later testified that, on the morning of trial, he drove from the south end of the bridge to the end of the exit ramp and the odometer on his car indicated that this distance was exactly one-tenth of a mile.

It is within the province of the jury to determine factual differences. After reviewing the record as a whole, we have determined that, even if the trial court was in error in sustaining the objection, we cannot say it more probably than not affected the judgment nor that it resulted in prejudice to the judicial process. *See* Rule 36(b) T.R.A.P.

### *Lane's Motion for a New Trial*

In light of the foregoing, we conclude that the trial court did not err in denying Lane's motion for a new trial.

### *Conclusion*

For the reasons set forth above, the judgment is affirmed. Costs of this appeal are taxed to Lane, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
HIGHERS, J. (Concurs)