IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 13, 2022 Session

## JESSICA MARIE FORSYTHE ET AL. v. JACKSON MADISON COUNTY GENERAL HOSPITAL DISTRICT ET AL.

**Appeal from the Circuit Court for Madison County**
**No. C-17-317        Roy B. Morgan, Jr., Judge**

_____

### No. W2021-01228-COA-R3-CV

_____

The trial court granted the defendant medical providers summary judgment on the basis of the plaintiff's failure to comply with the Tennessee Health Care Liability Act's pre-suit notice and good faith certificate requirements. On appeal, the plaintiff, an employee of the defendants, argues that her claim does not relate to the provision of health care services and that she was therefore not required to give pre-suit notice or file a good faith certificate. Because we conclude that the trial court did not err in determining that the claim is related to the provision of health care services, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY ARMSTRONG, JJ., joined.

W. Bryan Smith, Memphis and T. Verner Smith, Jackson, Tennessee, for the appellants, Jessica Marie Forsythe and Cody Forsythe.

Russell E. Reviere and Brandon W. Reedy, Jackson, Tennessee, for the appellee, Jackson Madison County General Hospital District, Pathways of Tennessee, Inc., and West Tennessee Healthcare, Inc.

## OPINION

### I. FACTUAL & PROCEDURAL BACKGROUND

Because this case was resolved by summary judgment, we take the facts from the undisputed facts agreed to by the parties. On Thanksgiving Day in 2016, Don Fitzgerald White presented at Defendant/Appellee Pathways of Tennessee, Inc., d/b/a Pathways

Behavioral Health Services ("Pathways"). Mr. White was accompanied by his father to Pathways. Mr. White's father brought him to this facility because Mr. White was seen in the hospital emergency department the previous day, where he received stabilizing treatment for a self-inflicted knife wound to his chest, as well as appropriate psychiatric screening and treatment. The treating physician, after consulting with a crisis clinician, ultimately determined that Mr. White was stable for discharge and, thus, discharged Mr. White from the hospital emergency department with instructions to seek outpatient care at Pathways if needed or his condition worsened.

Plaintiff/Appellant Jessica Marie Forsythe ("Plaintiff") was employed as a psychiatric technician at Pathways, and she was responsible for the intake and admission of patients to the facility. Pathways implements policies, procedures, and practices regarding a variety of subjects including, but not limited to, safety and security. Pathways staff, including Plaintiff, participate in regular training regarding these policies and procedures. One such policy, Policy No. 909.04 provides, in relevant part, as follows:

1.      When a patient presents to Crisis Triage and is considered high risk due to suicidal or homicidal ideations, psychosis, elopement potential, and/or intoxication, the following precautions will be implemented:

      A.      If a patient is suicidal, homicidal, experiencing psychosis, and/or an elopement risk, he/she will be monitored at all times and his/her belongings will be kept at the desk with the staff.

      B.      Security may be contacted to be stationed in Crisis Triage for closer monitoring. If the patient becomes violent, the Jackson Police Department (JPD) may be contacted by phone or through using panic buttons that are available throughout crisis Triage. If a patient is a danger to himself/herself or others and demands to leave Crisis Triage, the triage staff/security will attempt to stop the patient. If unable to stop from leaving, the JPD will be contacted. If the patient is in need of restraint/seclusion, he/she will be transported to the emergency room by the police.

This was the policy in place when Mr. White presented at Pathways with his father around 10:00 am on Thanksgiving morning. After learning Mr. White's name, Plaintiff searched the computer system, learned that Mr. White had been admitted to the emergency department the day before, and apprised herself of the reasons Mr. White presented for treatment previously.[1] As to her concerns about whether Mr. White posed a risk of

---

[1] The previous day, Plaintiff had also heard "about a patient with a self-inflicted knife wound to the chest and that the police were bringing him into the ER" through the scanner. After hearing this information, Plaintiff thought, "[t]his is a Pathways patient"; however, Plaintiff had no involvement with the patient that

- 2 -

violence, Plaintiff later testified that she

> knew what he did the day before, but he didn't give me any indication to, you know, worry any more, I would say. You know, any more than normal. I knew what he did the day before, but it wasn't -- like, his behavior at the time wasn't showing anything erratic or -- you know, as I call it, my radar.

> \* \* \*

> They'll tell you, like, my radar was one of the best as far as, you know, sensing that, or, you know, sensing what may come, as far as seeing a patient, you know, what could possibly happen. Because I've called security many times and was like, you know, Please come over here, just to prevent something, or to get it from not getting to that point.

But Plaintiff's "radar" did not go off with Mr. White:

> If he would have been coming in screaming, yelling, saying he was seeing things and all of that, I would have -- you know, the radar would have went off. But he was -- you know, he was calm at the time, and he didn't show any of those behaviors. So I personally, you know, thought he was really trying to get help at that point.

While Mr. White and his father were in the waiting room, an on-call counselor arrived at Pathways to perform an assessment of Mr. White, at which time Plaintiff left the area and went upstairs to get herself and the counselor something to eat. At that point, neither Plaintiff nor the counselor had any concerns about Mr. White, and Plaintiff had no concerns about leaving Mr. White alone with the counselor. Indeed, Plaintiff later testified that had she had concerns, she would not have left the counselor alone for any reason, even just to use the restroom.

Soon Plaintiff returned with food for both herself and the counselor. Because she forgot drinks, the counselor left to retrieve drinks. Plaintiff remained in a downstairs area with Mr. White and his father at this time. Plaintiff admitted that she had no concerns with being left with Mr. White and his father. Unfortunately, Plaintiff's trust in Mr. White was misplaced, as he walked through a door to where Plaintiff was sitting at a desk and attacked her with a knife after the counselor left. The attack was "sudden[] and without warning." Security guards and law enforcement arrived within minutes, but Mr. White refused to comply with their directives to stop the attack. Mr. White was only subdued after he was shot by a law enforcement officer. Plaintiff fortunately survived; Mr. White did not.

---

day.

On November 22, 2017, Plaintiff, along with her husband Cody Forsythe,[2] filed a complaint against Pathways, and its owners or related entities, Defendant/Appellee Jackson Madison County General Hospital District d/b/a Jackson Madison County General Hospital and Defendant/Appellee West Tennessee Healthcare, Inc. (collectively, "Defendants"). Plaintiff also named as defendants Abby Marie Rardin Grider, M.D., and Emergency Medical Care Facilities, P.C. ("EMCF"), who were alleged to have provided Mr. White with medical care the day prior to the attack. On June 11, 2018, the trial court entered an order dismissing Dr. Grider and EMCF on the basis of Plaintiff's admitted failure to comply with the good faith certificate and pre-suit notice requirements of the Tennessee Health Care Liability Act ("THCLA"). The trial court, however, later declined to grant Defendants' motion to dismiss on that basis. The trial court cautioned Plaintiff, however, that any claim that survived the failure to comply with the THCLA could not involve "medical decision making and judgment."

Discovery ensued, including the deposition of Plaintiff. Eventually, Defendants filed a motion for summary judgment arguing that (1) the undisputed facts demonstrated that Plaintiff's claim against Defendants was a health care liability action because it involved medical judgment; (2) Defendants were immune from suit as government entities performing discretionary functions; and (3) the incident was not reasonably foreseeable. Defendants included with their motion a statement of undisputed material facts to support their arguments. Plaintiff responded to Defendants' motion by, inter alia, denying that the claim against Defendants was a health care liability action. Instead, Plaintiff argued, her claim involved only a premises liability-type action—that is, the claim was based "solely on allegations of the failure to exercise ordinary care in providing security for, and protection from, foreseeable acts of violence on the premises." Plaintiff also submitted additional undisputed facts that she argued were relevant to adjudication of Defendants' motion. Defendants denied or objected to most of Plaintiff's proffered facts. Defendants, however, agreed that violent patients were often brought to Pathways by law enforcement officers or group homes and that Pathways staff complained of and participated in meetings involving the inadequate protection of the staff.

Defendants' motion for summary judgment was heard on June 11, 2021. At the conclusion of the hearing, the trial court ruled in favor of Defendants on the basis that Plaintiff's claim was, in essence, a health care liability claim. The trial court later entered a written order on September 16, 2021, in which it expressly incorporated its oral ruling and gave additional reasoning for its decision. The trial court ruled, however, that Defendants were not entitled to summary judgment on the issue of foreseeability or discretionary function immunity. Plaintiff thereafter appealed to this Court.

---

[2] Although Mr. Forsythe was a party to this case, we refer to Mrs. Forsythe by the singular "Plaintiff" for ease of reading, as this is how she is characterized in the undisputed material facts agreed to by the parties.

## II. ISSUE PRESENTED

Plaintiff raises a single issue in this appeal, asking whether the trial court erred in concluding that Plaintiff's case "was a Health Care Liability Action and granting summary judgment to Defendants on the basis that [Plaintiff] failed to comply with the pre-suit notice and certificate-of-good-faith requirements contained in the Health Care Liability Act."

## III. STANDARD OF REVIEW

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. Our supreme court has held:

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production by either (1) affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. . . . [S]ummary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. . . .

*Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 264–65 (Tenn. 2015).

This Court reviews the trial court's ruling on a motion for summary judgment *de novo* with no presumption of correctness, as the resolution of the motion is a matter of law. *Rye*, 477 S.W.3d at 250 (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010)). We view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002).

## IV. ANALYSIS

The genesis of the dispute in this case stems from Plaintiff's decision to file suit

against Defendants without giving Defendants pre-suit notice or obtaining a good faith certificate as outlined in the THCLA. Plaintiff argues that no such notice or certificate was required because this case is not governed by the THCLA. Defendants insist that it is, and that Plaintiff's failure to comply with the statute's requirements should result in dismissal of this case.

Under the THCLA, any plaintiff "asserting a potential claim for health care liability" must give pre-suit notice to the defendants pursuant to Tennessee Code Annotated section 29-26-121. Additionally, "[i]n any health care liability action in which expert testimony is required by § 29-26-115, the plaintiff or plaintiff's counsel shall file a certificate of good faith with the complaint." Tenn. Code Ann. § 29-26-122(a).[3] The remedy for failure to comply with the pre-suit notice requirement is generally dismissal without prejudice. ***Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs., Inc.***, 418 S.W.3d 547, 560 (Tenn. 2013). The remedy for failure to file a good faith certificate is dismissal with prejudice. Tenn. Code Ann. § 29-26-122(c).

Both the pre-suit notice and good faith certificate requirements are predicated on the fact that the plaintiff is pursuing a "health care liability action." The THCLA provides the following definition for this type of action:

> "Health care liability action" means any civil action, including claims against the state or a political subdivision thereof, alleging that a health care provider or providers have caused an injury related to the provision of, or failure to provide, health care services to a person, regardless of the theory of liability on which the action is based . . . .

Tenn. Code Ann. § 29-26-101(a)(1); *see also* Tenn. Code Ann. § 29-26-101(a)(2) (defining health care provider). "Health care services" include

> care by health care providers, which includes care by physicians, nurses, licensed practical nurses, pharmacists, pharmacy interns or pharmacy technicians under the supervision of a pharmacist, orderlies, certified nursing assistants, advance practice nurses, physician assistants, nursing technicians and other agents, employees and representatives of the provider, and also includes staffing, custodial or basic care, positioning, hydration and similar patient services.

---

[3] The good faith certificate requirements apply "*only* to health care liability claims requiring expert testimony." ***Newman v. State***, 586 S.W.3d 921, 926 (Tenn. Ct. App. 2019), *perm. app. denied* (Tenn. June 20, 2019) (quoting ***Est. of Bradley v. Hamilton Cnty.***, No. E2014-02215-COA-R3-CV, 2015 WL 9946266, at *5 (Tenn. Ct. App. Aug. 21, 2015)). Plaintiff does not raise as an issue, nor argue in her brief, that she was not required to file a certificate of good faith because no expert proof was required to prove her case.

Tenn. Code Ann. § 29-26-101(b). The statute further provides that "[a]ny such civil action or claim is subject to this part regardless of any other claims, causes of action, or theories of liability alleged in the complaint[.]" Tenn. Code Ann. § 29-26-101(c). Thus, a claim will be governed by the THCLA when "(1) it is a civil action; (2) the claim is against a health care provider; and (3) the harm complained of arises from "the provision of, or failure to provide, health care services." *Igou v. Vanderbilt Univ.*, No. M2013-02837-COA-R3-CV, 2015 WL 1517794, at *4 (Tenn. Ct. App. Mar. 27, 2015) (citing Tenn. Code Ann. § 29-26-101(a)(1)).

Here, there is no dispute that Plaintiff's claim is civil in nature or that both Defendants are healthcare providers within the meaning of section 29-26-101.[4] Moreover, there does not appear to be any dispute that the purpose of Mr. White's visit to Pathways on the day of the incident was to obtain health care services from Pathways. Rather, Plaintiff argues that, despite these facts, the tortious conduct by Defendants does not arise from the provision of health care services as required to fall within the ambit of the THCLA. Instead, she likens Defendants' allegedly tortious conduct to a physician causing an automobile accident on the way into the office.

In support of this position, Plaintiff cites a range of cases in which this Court has held that although torts were committed by health care providers in a health care setting, the claims nevertheless did not arise from health care services. Many of these cases involve assaults against patients. *See C.D. v. Keystone Continuum, LLC*, No. E2016-02528-COA-R3-CV, 2018 WL 503536 (Tenn. Ct. App. Jan. 22, 2018) (involving a claim where the staff member allegedly pulled a minor to the ground and stomped on his foot); *Lacy v. St. Thomas Hosp. West*, No. M2016-01272-COA-R3-CV, 2017 WL 1827021 (Tenn. Ct. App. May 4, 2017) (involving a claim that a doctor beat a patient); *Lacy v. Mitchell*, 541 S.W.3d 55 (Tenn. Ct. App. 2016) (involving a claim that a chiropractor hit the plaintiff with a folder). Others cases run the gamut from rape of a patient to squeezing a patient's hand too firmly during a handshake. *Compare Cordell v. Cleveland Tenn. Hosp., LLC*, 544 S.W.3d 331 (Tenn. Ct. App. 2017) (involving rape), *with Lacy v. Meharry Gen. Hosp.*, No. M2016-01477-COA-R3-CV, 2017 WL 6501915 (Tenn. Ct. App. Dec. 19, 2017) (involving a handshake). Like these cases, Plaintiff argues that her claim involves tortious conduct that is too tenuously related to the provision of health care services to qualify as a health care liability action. Plaintiff further distinguishes cases in which this Court has held that a claim related to the provision of health care services, including when an x-ray technician directed a patient to sit on a faulty stool during the test, *see Osunde v. Delta Med. Ctr.*, 505 S.W.3d 875, 884-85 (Tenn. Ct. App. 2016), or when a patient was injured during a transfer from a stretcher to a vehicle. *See Estate of Thibodeau v. St. Thomas Hosp.*, No. M2014-02030-COA-R3-CV, 2015 WL 6561223 (Tenn. Ct. App. Oct. 29, 2015). According to

---

[4] Specifically, in her brief, Plaintiff states that "Defendants are, certainly, health care providers under the statute."

Plaintiff, these cases illustrate that the following must be present for a claim to relate to the provision of health care services: (1) the claim must "sufficiently relate to the provision of actual health care"; (2) "the services provided must be sufficiently related to what makes the person undertaking to give the services a health care provider"; and (3) "the actions at issue must call for the exercise of health care judgment or decision making[.]" And according to Plaintiff, the "core problem" with Defendants' position is a lack of medical judgment—that is, Plaintiff's claim "has nothing to do with the exercise of health care judgment or decision making in the context of a patient/provider relationship."

Respectfully, we disagree. As an initial matter, we note that the THCLA's definition of "health care liability action" is intended to be broad. *See Cooper v. Mandy*, 639 S.W.3d 29, 35 (Tenn. 2022) (noting that the Tennessee General Assembly "adopt[ed] a broad definition of 'health care liability action' in section 29-26-101(a)(1)"). The purpose of this enactment was to define "health care liability" "broadly enough to 'cast[] a wide net over civil claims that arise within a medical setting.'" *Id.* (quoting *Cordell*, 544 S.W.3d at 336). "Because this definition is so broad, most claims arising in a medical setting will be health care liability claims." *Id.* (citing *Osunde*, 505 S.W.3d at 884–85 ("Given the breadth of the statute, it should not be surprising if most claims now arising within a medical setting constitute health care liability actions.")). Keeping these principles in mind, we turn to examine the claim alleged against Defendants in this case.

Here, Plaintiff frames her claim against Defendants as involving "Defendants' failure to take actions their security policy required them to take[.]" To reiterate, Policy No. 909.04 provides, in part, as follows:

> 1.  When a patient presents to Crisis Triage and is considered high risk due to suicidal or homicidal ideations, psychosis, elopement potential, and/or intoxication, the following precautions will be implemented:
>
>     A.  If a patient is suicidal, homicidal, experiencing psychosis, and/or an elopement risk, he/she will be monitored at all times and his/her belongings will be kept at the desk with the staff.

The trial court specifically found that Policy No. 909.04 requires that, in order for the monitoring and removal of belongings to be required, "there was first to be a determination made by a health care provider that the patient . . . is high risk due to suicidal or homicidal ideations . . . . This prerequisite determination requires expert, medical judgment by a health care provider."

We agree with the trial court. As written, this portion of the policy has two steps. First, certain precautions will be taken "when a patient presents" to triage and "is considered high risk due to[, inter alia,] suicidal or homicidal ideations[.]" Once that hurdle has been met, a patient who "is suicidal [or] homicidal" is required to be monitored at all

times and have his or her belongings removed from his or her person. Thus, Policy No. 909.04 is not self-executing. Instead, the security requirements in Policy No. 909.04 are not triggered unless and until the patient is deemed at high risk due to suicidal or homicidal ideations and there is a determination that the patient is presently "suicidal or homicidal." *Cf.* **In re D.A.H.**, 142 S.W.3d 267, 276 (Tenn. 2004) (noting that "is" is present tense). And, of course, someone has to make that determination. In this case, that someone was Plaintiff herself.[5]

Still, Plaintiff attempts to persuade this Court that no medical judgment was required for this policy to be triggered because of the "objective, non-diagnostic fact that [Mr]. White had attempted suicide" the previous day. To be sure, Plaintiff would be correct if the heightened security requirements were triggered by a past suicide attempt. But that is not what the policy required. Instead, the policy required that the patient both suffer from suicidal or homicidal ideations and be suicidal or homicidal. Perhaps it is true that a prior suicide attempt is sufficient to qualify as having suicidal ideations or being suicidal. It is also possible that there is no distinction between having suicidal or homicidal ideations and being suicidal or homicidal, despite the difference in language chosen by the policy's drafter. A recent case confirms, however, that neither this Court nor a lay person are qualified to make determinations as to whether certain past behaviors necessitate heightened security measures, as these questions require medical expertise. *See* **Newman v. State**, 586 S.W.3d 921 (Tenn. Ct. App. 2019), *perm. app. denied* (Tenn. June 20, 2019).

In **Newman v. State**, a patient in a state-run psychiatric facility was attacked and killed by another patient. The attacker was well-known by the facility staff to be violent without provocation, but was allowed to roam the facility unsupervised. *Id.* at 923. The

---

[5] In particular, Plaintiff agreed to the following statement of undisputed material fact proffered by Defendants: "Plaintiff . . . a psychiatric technician, was . . . responsible for the intake and admission of patients to the facility. Defendants' statement of undisputed material facts also alleged the following:

> 31. Plaintiff was the first point of contact [Mr.] White had with Pathways when he arrived with his father on Thanksgiving Day in 2016.
> 32. When Plaintiff was on duty at Pathways, she was responsible for notifying Defendants of potential risks of harm of which she was aware.

(Citations omitted).

Plaintiff admitted the first allegation but denied the second. In her denial, however, Plaintiff did not cite any countervailing proof. As such, this allegation will be considered undisputed for purposes of summary judgment. *See* **Kidd v. Dickerson**, No. M2018-01133-COA-R3-CV, 2020 WL 5912808, at *11 (Tenn. Ct. App. Oct. 5, 2020), *perm. app. denied* (Tenn. Feb. 4, 2021) ("Three responses by the Plaintiff were not supported by citation to the record; we therefore consider them to be undisputed.") (citing **Duncan v. Lloyd**, No. M2004-01054-COA-R3CV, 2005 WL 1996624, at *5 (Tenn. Ct. App. Aug. 18, 2005) ("Merely informing the trial court that the record demonstrates disputed facts, without specifically addressing those facts in the response and specifically citing to portions of the record evidencing dispute, does not satisfy Rule 56. Any fact not *specifically* disputed *with* citations to the record to support the alleged dispute may be deemed admitted.")).

patient's surviving spouse filed a claim against the State in the Tennessee Claims Commission. The State moved to dismiss on the basis that the plaintiff's claim was a health care liability claim subject to pre-suit notice and the certificate of good faith requirements. The Claims Commissioner denied the motion to dismiss and eventually awarded the plaintiff $230,690.00 in damages. The State thereafter appealed to this Court. *Id.* at 924.

Like in this case, the plaintiff in *Newman* did not assert that she complied with any of the THCLA's requirements; rather, she argued that her suit involved only ordinary negligence, rather than health care liability. *Id.* at 926. In addressing this argument, the Court focused on older cases involving whether expert proof was required to show negligence in how an impaired patient was supervised. In those cases, this Court held that expert proof was necessary to determine whether the patients were properly supervised. *See id.* at 927 (citing *Cannon v. McKendree Village, Inc.*, 295 S.W.3d 278, 283 (Tenn. Ct. App. 2008) (holding that the decision of whether to restrain a patient is "a matter of medical science or art requiring skills not ordinarily possessed by lay persons"); *Tucker v. Metro. Gov't of Nashville & Davidson Cnty.*, 686 S.W.2d 87, 94 (Tenn. Ct. App. 1984) ("The proper treatment of a patient with serious mental problems . . . and who is in a catatonic state, is not within the common knowledge of ordinary lay persons.")); *see also Turner v. Jordan*, 957 S.W.2d 815 (Tenn. 1997) (noting that the case did not involve the necessity of expert proof but holding that it suggested that expert proof is necessary to determine the acceptable standard for a psychiatrist to protect a nurse from a violent patient). Based on these cases, the Court of Appeals held that "the question of whether and how to restrain and/or supervise a potentially dangerous mental patient involves knowledge and understanding of his diagnosis and medical history." *Newman*, 586 S.W.3d at 927 (quoting *Newman v. Guardian Healthcare Providers, Inc.*, No. M2015-01315-COA-R3-CV, 2016 WL 4069052, at *7 (Tenn. Ct. App. July 27, 2016) (companion case involving same allegations against different defendant)). The Court therefore held that medical testimony was necessary, that the claim was governed by the THCLA, and that the plaintiff's failure to file a good faith certificate was fatal to her action. *Id.* at 928 ("[W]hen the issue of negligence involves 'the mental capacity and proclivities of' a psychiatric patient, expert testimony is required." (quoting *Guardian Healthcare*, 2016 WL 4069052, at *7)).

Plaintiff assets, however, that *Newman* is distinguishable because that case did not involve the failure to follow a "clear, non-discretionary safety and security policy[.]" According to Plaintiff, the critical allegation in *Newman* was that the defendants "failed to assess either [patient's] need for constant monitoring correctly and failed to execute that monitoring correctly in the confines of the mental health facility. Both of those failures required the use of health care judgment." The difference, Plaintiff contends, is that Policy No. 909.04 removed all discretion—all medical judgment—from the equation in this case.

Respectfully, we fail to see the distinction. Here, Pathways had a policy that a patient was to be monitored and have his or her belongings removed only once it was determined that the patient was suffering from, inter alia, suicidal or homicidal ideations

- 10 -

and was suicidal or homicidal. While this policy may arguably have removed some discretion as to "*how* to restrain and/or supervise a potentially dangerous mental patient[,]" it simply does not remove the medical judgment necessary to determine "*whether*" to do so. *Newman*, 586 S.W.3d at 927 (emphasis added). Instead, some person, and in this case Plaintiff herself, was required to determine whether the patient should be subject to the heightened security requirements due to, inter alia, suicidal or homicidal ideations. And the question of "whether . . . to restrain and/or supervise a potentially dangerous mental patient involves knowledge and understanding of his diagnosis and medical history[.]" *Id.* This is the exact question that Plaintiff was both tasked with making and trained to make. And despite knowing of Mr. White's previous suicide attempt, Plaintiff did not believe that his present state of mind required such precautions.[6]

We further note that while Mr. White's actions certainly involved the kind of intentional conduct that has been held to not relate to the provision of health care services, the claim asserted by Plaintiff against Defendants does not involve intentional acts of violence but negligence in how Defendants' staff is trained and its security policy is implemented. A case cited by Plaintiff illustrates this distinction. *See C.D. v. Keystone Continuum, LLC*, No. E2016-02528-CO A-R3-CV, 2018 WL 503536 (Tenn. Ct. App. Jan. 22, 2018). In *C.D. v. Keystone Continuum LLC*, the plaintiff raised, inter alia, two claims: (1) that a staff member at a youth residential treatment facility attacked him; and (2) that the defendant residential treatment facility failed to supervise and train its employees in order to ensure the safety of the minor residents. *Id.* at *5, 6. As previously discussed, we held that the claim of "willful assault and battery" did not relate to the provision of health care services. *Id.* at *5.

The Court concluded, however, that the claim of negligent training and supervision regarding the safety of residents did relate to the provision of health care services. *Id.* at *6. First, we noted that the THCLA specifically provides that heath care services includes "staffing, custodial or basic care . . . and similar patient services" Tenn. Code Ann. § 29-26-101(b). The Court further cited the dicta of an earlier case that considered a hypothetical similar to that presented in *C.D.*:

> Negligence is not charged against [the hospital] for failing to protect or monitor [the plaintiff]. As far as the original complaint will admit, the liability of [the hospital] appears to be predicated entirely on the doctrine of respondeat superior.
>
> * * *

---

[6] In her deposition, Plaintiff did claim to ask Mr. White if he had anything sharp and testified that she would have asked him to give it to her if he did. This fact, however, was not submitted as a statement of undisputed material fact by Plaintiff, nor is it argued in any fashion in Plaintiff's brief. While it may be true that Plaintiff asked Mr. White to produce any sharp objects that he possessed, Plaintiff's other testimony indicates that she was not concerned that Mr. White needed additional security due to the possibility of violence.

- 11 -

[H]ad the original complaint brought a negligence claim against [the hospital] directly and asserted that it was liable due to its failure to provide appropriate care, supervision, or monitoring, the complaint would have alleged that a "health care provider . . . caused an injury related to the . . . failure to provide . . . health care services." . . .

*Id.* at *6 (quoting *Cordell*, 544 S.W.3d at 339). Applying this reasoning, we concluded that the allegation of the treatment facility's failure to train and monitor its staff to ensure the protection of residents was related to the provision of health care services. *Id.*; *accord Youngblood ex rel. Est. of Vaughn v. River Park Hosp., LLC*, No. M2016-02311-COA-R3-CV, 2017 WL 4331042, at *3–4 (Tenn. Ct. App. Sept. 28, 2017) (holding that failure to monitor a patient with dangerously hot coffee related to the provision of health care services). Plaintiff raises a very similar allegation in this case—that Defendants failed to ensure implementation of their own security policy in order to protect the safety of its staff and patients. As such, the reasoning in *C.D.* dictates that we reach the same conclusion here.

In sum, despite the interjection of Policy No. 909.04, this case presents the same question as in *Newman*—whether Pathways failed to properly assess Mr. White's need for monitoring and failed to execute the monitoring in a way to prevent Plaintiff's injuries. Because the question of whether and to what extent a mental health patient should be monitored is a question involving medical expertise, *Newman*, 586 S.W.3d at 927, the alleged failure to implement Policy No. 909.04 occurred as part and parcel of the health care services that Pathways offered to Mr. White. *See also C.D.*, 2018 WL 503536, at *6. The allegation that Pathways negligently failed to follow its own security policy is therefore "related to" the provision of health care services. Tenn. Code Ann. § 29-26-101(a)(1). As such, the trial court did not err in concluding that Plaintiff's claim, however characterized, was a health care liability action subject to the intendent responsibilities of the THCLA.

Plaintiff makes a final argument involving the medical records portions of the THCLA in support of reversal of the trial court's judgment. Plaintiff notes that under the THCLA, a plaintiff must include a HIPAA-compliant medical release allowing the defendants to obtain the record from each other. But, Plaintiff asserts, she was never a patient of Defendants and therefore they held no medical records of hers that are relevant to her claim. Because a HIPAA release would serve little function here, Plaintiff asserts that this situation illustrates why her claim should not constitute a health care liability action subject to the THCLA's requirements.

To be sure, Plaintiff's argument is a novel one. However, we can find no instance where this argument was raised in the trial court. It is well-settled that an appeal is not an opportunity for a litigant to assert new arguments not raised before the trial court or "change its strategy or theory in midstream, and advocate a different ground or reason in

- 12 -

this Court." ***State v. Abbott***, No. 01C01-9607-CC-00293, 1996 WL 411645, at *2 (Tenn. Crim. App. July 24, 1996) (citing ***State v. Aucoin***, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988)). The purpose of this rule is to prevent a litigant from raising an issue on appeal when his or her adversary had no "opportunity to rebut the issue with evidence and argument." ***Kendall v. State***, No. W2007-02828-CCA-R3-PC, 2009 WL 1424192, at *2 (Tenn. Crim. App. May 21, 2009). Because this argument was not raised in the trial court, Defendants were not presented an opportunity to submit proof as to how the medical records would have been relevant in this case. As a result, we decline to address this argument beyond noting that the Tennessee General Assembly chose to draft the THCLA in a particularly broad manner. ***Cooper***, 639 S.W.3d at 35. This choice means that cases that might not have been traditionally characterized as medical malpractice may be caught in the THCLA's net. We are simply not permitted to question the logic of the Tennessee General Assembly's decision to place these types of cases within the THCLA's ambit. Suffice it to say that Plaintiff's claim is related to the provision of health care services and therefore is subject to the pre-suit and good faith certificate requirements of the THCLA. Because Plaintiff complied with neither requirement, dismissal with prejudice was proper. Tenn. Code Ann. § 29-26-122(c).

## V. CONCLUSION

The judgment of the Madison County Circuit Court is affirmed, and this cause is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellants, Jessica Marie Forsythe and Cody Forsythe, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 13 -